Filed 9/23/13  P. v. Tyler CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDREW MICHAEL TYLER<br><br>    Defendant and Appellant. | B240760<br><br>(Los Angeles County<br>Super. Ct. No. TA117830) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Stephanie A. Miyoshi and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Andrew Michael Tyler appeals his judgment of conviction of one count of continuous sexual abuse of a child (Pen. Code,[1] § 288.5, subd. (a)), one count of aggravated sexual assault of a child by rape (§ 269, subd. (a)(1)) and one count of aggravated sexual assault of a child by oral copulation (§ 269, subd. (a)(4)). Tyler's sole contention on appeal is that his conviction for aggravated sexual assault by rape must be reversed because the evidence was insufficient to prove that an act of sexual penetration occurred. Because substantial evidence supported Tyler's conviction, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Prosecution Evidence

A.B. is Tyler's stepdaughter. She lived in a three-bedroom house with Tyler, her mother, her twin sister J.B., her younger sister T.B., and Tyler's adult daughter, Andria. In 2010, after A.B. turned 11 years old, Tyler began to look at her in a manner that made her uncomfortable. On more than one occasion, Tyler "bumped" his penis against A.B.'s buttocks and touched her breasts over her clothing with his hands. At other times, Tyler "sucked" A.B.'s breasts under her clothing when they were alone in the bedroom that he shared with her mother. On another occasion, Tyler unzipped his pants and forced A.B. to rub his penis with her hand, telling her "[l]et me show you how to do it." Tyler warned A.B. that if she told anyone about the touching, he would her hurt her or kill her family. Because A.B. had seen Tyler physically assault her mother in the past, she believed his threats and did not report his conduct to anyone.

On April 27, 2011, when she was 12 years old, A.B. was at home. Her mother was at work, and her two sisters and stepsister were in their room using the computer. Tyler repeatedly called A.B. into his bedroom. After A.B. went into the bedroom, Tyler closed the door and turned up the volume on a radio that was playing in the room. He grabbed A.B. by the straps of her tank top, threw her onto the bed, and pinned her down with his arms and legs. As A.B. struggled to get up, Tyler lifted her shirt, pulled down

---

[1] All further statutory references are to the Penal Code.

2

her pants, and shaved her vagina with a razor. Tyler then picked her up and pushed her into the closet. He closed the closet door, pinned A.B. to the floor, and lifted her bra. He "sucked" A.B.'s breasts and vagina as she screamed for help. Tyler then put his penis "between the lips" of A.B.'s vagina. As Tyler's penis was "between the first opening of [A.B.'s] vagina," he moved his body back and forth against her. A.B. saw "white stuff" that looked like "snot" come out of his penis. Tyler wiped the substance with a piece of cloth and threw the cloth into a hamper in the closet. At that point, Tyler let A.B. get up and leave the room. He told A.B. to wash his clothes, which she did.

Shortly thereafter, A.B. spoke to her mother on the telephone and was crying hysterically. When her mother asked her what was wrong, A.B. hung up the phone. A.B.'s mother called back and could hear Tyler in the background asking A.B., "[d]id you call your mom?" When the line was disconnected a second time, A.B.'s mother decided to leave work and go home. After the call from A.B.'s mother, Tyler began hitting A.B. with a leather belt, and asked her why she had "run [her] mouth." A.B. was screaming and crying as she ran into her bedroom where her sisters and stepsister were using the computer. A.B.'s stepsister, Andria, asked her what had happened, and A.B. repeatedly said that she was tired of Tyler touching her.

When A.B.'s mother arrived home, she saw that A.B. was visibly shaken. A.B. was crying as she told her mother that Tyler had touched her, given her oral sex, and put her in the closet. A.B.'s mother confronted Tyler who denied touching A.B. and stormed out of the house. After threatening to hit A.B.'s mother, Tyler got into his car and drove away as she called the police. When Tyler returned a few minutes later, A.B. and her family left the house and went to the corner to wait for the police. Tyler drove away a second time, but was stopped by the police at the corner and taken into custody.

Later that day, A.B. was transported to a local hospital for a sexual assault examination which was conducted by a forensic nurse, Susan Barie.[2] In describing the

---

**2**    Nurse Barie also conducted a suspect sexual examination on Tyler.

specific acts that were committed during the assault, A.B. told Nurse Barie that Tyler "was licking [her], and he was sticking his stuff in [her]." She reported that Tyler had shaved her pubic area, had licked her genitals and her breasts, and may have penetrated her vagina with his penis. She was uncertain, however, whether Tyler's penis had penetrated her vagina or her anus. A.B. denied that she had any pain or bleeding in her genital area. In conducting the physical exam, Nurse Barie observed multiple scratches and bruises on A.B.'s left arm and shoulder. She also saw that A.B.'s pubic area had been shaved. With a florescent lamp, Nurse Barie detected the possible presence of saliva or seminal fluid on A.B.'s inner thighs, but not on her genitals or anus. Nurse Barie did not find any disruption to the surface tissue of A.B.'s vagina during the exam. She was unable to insert a speculum into A.B.'s vagina, however, and could only partially insert cotton swabs because A.B. stated that it was painful. Nurse Barie made no findings of injury or trauma to A.B.'s genitals or anus, but indicated that it was common to have no evidence of injury even in forced vaginal or anal intercourse.

The swabs collected from A.B. and Tyler during their respective sexual assault examinations were analyzed for biological and DNA evidence by senior criminalists in the Los Angeles County Sheriff's Department. Swabs taken from A.B.'s neck, breasts, and vulva showed the possible presence of saliva. Tyler was excluded as a possible contributor to the DNA found on A.B.'s right breast and neck. There were at least two contributors to the DNA found on A.B.'s left breast, but the sample did not contain enough DNA information to identify or exclude the possible contributors. No male DNA was detected in the sample taken from A.B.'s vulva, and A.B. was excluded as a possible contributor of DNA in the sample taken from Tyler's penis.

During a May 4, 2011 search of A.B.'s home pursuant to a warrant, the police seized a portion of the carpet in the master bedroom closet, which was also analyzed by senior criminalists in the Los Angeles County Sheriff's Department for biological and DNA evidence. The carpet sample tested positive for the presence of semen. Tyler and A.B. were determined to be the two major contributors to the DNA found on the carpet,

4

which was consistent with Tyler sexual assaulting A.B. on the carpet and then ejaculating.

## II. Defense Evidence

Tyler's sister, Evelyn, testified on his behalf. Evelyn recounted a conversation she had in the fall of 2009 with A.B.'s mother about sexual abuse allegations that A.B. had made against Tyler. According to Evelyn, A.B.'s mother said that A.B. had accused Tyler of molesting her, but A.B. later admitted that she had lied and that she had been encouraged by an aunt to make up the allegations.

## III. Jury Verdict and Sentencing

At the conclusion of the trial, the jury found Tyler guilty as charged of one count of continuous sexual abuse of a child, one count of aggravated sexual assault of a child by rape, and one count of aggravated sexual assault of a child by oral copulation. Tyler was sentenced to a total state prison term of 50 years to life. He thereafter filed a timely notice of appeal.

## DISCUSSION

On appeal, Tyler challenges the sufficiency of evidence supporting his conviction for aggravated sexual assault of a child by rape in violation of section 269, subdivision (a)(1). He specifically contends that the evidence was insufficient as a matter of law to establish the element of sexual penetration because A.B. testified that Tyler placed his penis on top of, but not inside, her vagina. However, based on the entirety of the record before us, we conclude that there was substantial evidence to support Tyler's conviction.

In assessing a claim of insufficient evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the

evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Section 269, subdivision (a)(1) provides that "[a]ny person who commits any of the following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child: [¶] (1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261." Section 261, subdivision (a)(2) defines forcible rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: [¶] . . . [¶] (2) Where it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."

Any sexual penetration, however slight, is sufficient to complete the crime of rape. (§ 263; *People v. Wallace* (2008) 44 Cal.4th 1032, 1079.) Although sexual penetration is an essential element of rape, vaginal penetration is not required. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1371; *People v. Karsai* (1982) 131 Cal.App.3d 224, 232 disapproved on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.) Rather, "[p]enetration of the external genital organs is sufficient to constitute sexual penetration and to complete the crime of rape even if the rapist does not thereafter succeed in penetrating into the vagina." (*People v. Karsai, supra*, at p. 232 [victim's testimony that defendant pushed his penis between the lips of her vagina was sufficient to support rape conviction]; see also *People v. Quintana, supra*, at p. 1371 [evidence that

6

defendant penetrated victim's labia majora was sufficient to establish sexual penetration within meaning of section 289]; *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1097 [sexual intercourse required proof of "penetration of [the victim's] labia majora, not her vagina"].) Sexual penetration may be proved by circumstantial evidence. (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

During her direct examination, A.B. initially testified that, after Tyler committed an act of oral copulation, "he put his penis on top of [her] vagina." When the prosecutor asked A.B. to describe what Tyler did with his penis, A.B. again answered: "He put it on my vagina." The prosecutor continued with this line of questioning as follows:

Q:    You say he put it on your vagina?

A:    Like by the -- by my -- on my skin, the inside of my vagina.

Q:    Did he put it in or on?

A:    On.

Q:    Okay. What exactly did he do with his penis to your body?

A:    He put it -- out of the vagina and did like -- the two things that looked like lips, he put it -- not the -- probably the top of the lip -- the top of the lips of the vagina, it looked like.

Q:    Did you feel any pain when he did this?

A:    No.

Later during A.B.'s direct examination, the prosecutor sought to impeach her trial testimony on the subject of penetration with her testimony from the preliminary hearing. After directing A.B. to read a portion of her preliminary hearing testimony to herself, the prosecutor asked her the following series of questions:

Q:    So at the preliminary hearing, what you said was that you actually could feel his penis between the lips of your vagina --

A:    Yes.

Q:    -- Is that right?

7

A: Yes.

Q: And is that -- is that what happened? Is that where you could feel his penis?

A: Yes.

Q: And it's at that point that you blacked out?

A: No.

Q: When did you black out?

A: I don't remember.

Q: But you blacked out in the closet?

A: Yes.

Q: And you remember him putting his penis between the lips of your vagina?

A: Yes.

Q: And then the next thing that you remember is him wiping white snot out of his penis?

A: Yes.

On redirect examination, A.B. was asked to further elaborate about the movement of Tyler's body when he was on top of her in the closet. In response to the prosecutor's question about where Tyler had his penis when his body was moving back and forth against her, A.B. stated that his penis was "on [her] private part." The prosecutor then asked: "Is that when you felt it sort of between the first opening of your vagina?" A.B. answered: "Yes."

When A.B.'s trial testimony is read as a whole, it is sufficient to support a finding that some penetration, however slight, of her external genital organs occurred. As the Court of Appeal noted in *People v. Quintana*, *supra,* 89 Cal.App.4th at 1367, "[t]he vagina is only one part of the female genitalia, which also include . . . the labia majora, labia minora, and the clitoris." Any slight penetration of the labia majora, or outer lips of the vagina, is sufficient to constitute sexual penetration. (*Id.* at p. 1371; *People v. Karsai*, *supra*, 131 Cal.App.3d at pp. 232-233; *People v. Dunn*, *supra*, 205 Cal.App.4th at pp. 1097-1098.) Although A.B. initially testified that Tyler put his penis "on top of [her]

8

vagina," she answered in the affirmative when specifically asked whether she felt Tyler's penis "between the lips of [her] vagina." A.B. also answered in the affirmative when asked whether she felt Tyler's penis "between the first opening of [her] vagina" as he was moving his body back and forth against her.

Accordingly, while there were some inconsistencies in A.B.'s testimony on the subject of penetration, it is well-established that conflicts and inconsistencies in testimony, even those within the testimony of the same witness, are to be resolved by the trier of fact. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 ["[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact"]; *People v. Koontz* (1959) 171 Cal.App.2d 633, 634 [where sexual assault victim gave conflicting testimony about whether penetration occurred, trier of fact "was entitled to accept as true the testimony of the [victim] on direct examination rather than the conflicting testimony which she later gave"].) Moreover, "unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young*, *supra*, at p. 1181; see also *People v. Richardson* (2008) 43 Cal.4th 959, 1030-1031 ["testimony of a single witness is sufficient for the proof of any fact"].) Based on A.B.'s testimony that she felt Tyler's penis between the lips of her vagina, the jury reasonably could have found that Tyler committed an act of sexual penetration within the meaning of section 269, subdivision (a)(1).

Further, contrary to Tyler's assertion on appeal, the forensic evidence presented at trial did not establish the absence of any sexual penetration. Although the nurse who conducted A.B.'s sexual assault examination did not find evidence of injury or trauma to A.B.'s genitals or seminal fluid on her genitals, she specifically testified that the absence of such findings was not uncommon even in the case of forced vaginal intercourse. Additionally, while no forensic evidence was found on either A.B.'s or Tyler's genitals that connected them to one another, the DNA evidence found on the carpet in the closet showed that A.B. and Tyler were the two major contributors to that DNA, and that the carpet contained seminal fluid. At a minimum, such evidence could corroborate A.B.'s testimony that Tyler had ejaculated in the closet as he was sexually assaulting her.

9

Therefore, when the totality of the record is considered, A.B.'s testimony about Tyler's actions, along with the DNA evidence recovered from the carpet, was sufficient to support a finding that Tyler sexually penetrated A.B.'s external genitalia for the purpose of rape. Tyler's conviction for aggravated sexual assault of a child by rape was supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.

ZELON, J.

We concur:

WOODS, Acting P. J.

SEGAL, J.*

---

*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.